## THE ROCHESTER.
### No. 13588.

District Court, E. D. New York.
April 10, 1934.

Burlingham, Veeder, Fearey, Clark & Hupper and Eugene Underwood, all of New York City, for libelant.

Purdy & Purdy and Edmund F. Lamb, all of New York City, for claimant.

CAMPBELL, District Judge.

This suit is brought to recover damages alleged to have been caused by collision.

Ownership and incorporation of the respective parties as alleged in the pleadings proven as alleged.

The tug Rochester was, during the currency of process hereunder, within this district and the jurisdiction of this court, and jurisdiction is conceded.

The Erie Railroad Company tug Rochester was a Diesel tug, and her engine controls were located in the pilot house.

On the night of September 28, 1932, the tug Rochester picked up, on the starboard side of the tug, in New York, a carfloat loaded with empty cars bound for Erie docks in Jersey City, and proceeded for the Erie docks at Jersey City, which are just above the Pennsylvania Railroad Company docks.

There is a dispatcher's office on the end of Erie dock 4, just above the ferry. Below Erie dock 4 is Erie dock 2, and below that is Pennsylvania dock M. Below Pennsylvania dock M follow in their order docks L and K.

There was at that time a dredging lighted buoy D, 185 yards 138 degrees true from southeast corner of pier 2, foot of Pavonia avenue, Jersey City, in 35 feet.

When the Rochester and her tow arrived quite a distance off between Erie docks 2 and 4, according to custom, she blew the customary location signal to the dispatcher, who replied with a signal indicating that the Rochester should put her tow in dock 2, that is between Erie dock 2 and Pennsylvania dock M.

The Erie Railroad had put 5 or 6 floats abreast on the south side of Erie dock 2. There were five boats, not more than two abreast, on the north side of the rack of Pennsylvania dock M, and the master of the Rochester said that none of these boats on the north side of dock M interfered with the navigation of the Rochester.

The master of the Rochester testified that the lighted dredging buoy did not interfere with his navigation.

There were seventeen floats abreast moored at the end of Pennsylvania dock L, and five or six floats at the end of Pennsylvania dock K.

Both of these last-mentioned docks extended out in the river a shorter distance than dock M.

Having received the location signal, the Rochester maneuvered to take her float into dock 2 by dropping down and heading up against a strong ebb tide, the wind being from the northwest and the night clear.

The master of the Rochester contends that he was prevented from taking his tow into dock 2 by an unlighted float, which looked like an Eastern District Terminal float, and which extended out from alongside pier M, well out into the river, and that he did not observe this float until about 225 feet therefrom.

The float in tow of the Rochester was 365 feet long and 37 feet beam.

The Rochester was about 102 feet long and 26 feet beam, and as the tow was made up, the stem of the Rochester was about as far aft from the bow of the float as the stern of the Rochester was forward of the stern of the float, and the pilot house of the Rochester was about 20 feet aft of her stem.

The mate of the Rochester was on top of the cars on the forward end of the float, but did not report the unlighted float, although he must have been about 150 feet nearer the float, if she existed, than was the master of the tug.

The evidence in the form of records of the Pennsylvania Railroad Company, which is much more impressive than mere recollection, convinces me that no such float, lighted or unlighted, was projecting out beyond the end of the rack of Pennsylvania dock M.

The Rochester, being in a position where her master believed he could not swing out into the river, without swinging his tow into sharp collision with floats at the end of the dock, backed and filled and dropped, slowing down the river at an angle, trying to straighten her up, and intentionally brought the Rochester into contact with the outer up-river corner of the Pennsylvania float 575, to straighten the Rochester and her tow so she could proceed up the river to dock 2.

There is a conflict as to the force of the contact, but in any event it was sufficient to cause the lines between the 575 and the boat inside of her, the Pennsylvania 527, to part, the 575 to go adrift, and the lines between the third and fourth floats out from the dock to part, and although the Rochester, with a line on the 575, was pushing in the 575 and the Pennsylvania tug Detroit, with a light float on her port side, blowing for help, was trying to hold the floats still at the end of dock L up, and the Pennsylvania tug Williamsport shov-

ed in the stern of the 575, the inner floats dropped down on the floats on the end of dock K and several floats of the Pennsylvania Railroad, to wit, 575, 527, 504, and 551 suffered damage.

The tug Williamsport, finding the Rochester in her way, told her to go on, and the Rochester and her tow, being straightened up, proceeded up and into Erie dock 2, where she landed the float she had in tow.

The 575 was made fast again to the Pennsylvania 527, the tug Williamsport was on the outside trying to hold up the floats, and the Detroit dropped down and got in until she was against the floats on K, and then got a line on the nearest of the floats that had swung down, pushed them up, and the Detroit and the Williamsport docked at pier L all of the floats that had gone adrift from it.

The floats in piers M, L, and K were properly lighted.

As I have before said, there was no unlighted float projecting out beyond the outer end of pier M. This I believe was definitely and surely established by the documentary evidence of the Pennsylvania Railroad Company. The only other place from which such a float could have come in or out was the Erie, and no documentary evidence that such a float had come from the Erie docks was offered, neither was any evidence offered on behalf of the Erie that any Eastern District Terminal float or tug was there at the time.

The failure of the mate of the Rochester, on the top of the cars acting as lookout, to report such a float to the master, is proof either that such float was not there, or that the Rochester was not maintaining an efficient lookout, which is a grievous fault, and there was no lookout on the Rochester herself.

As I view the situation, the initial difficulty of the Rochester was caused by the Erie Railroad Company placing so many floats abreast at pier 2, and the second difficulty was that the Rochester did not head in properly for pier 2, and could not straighten up.

The Rochester and her tow drifted down the river at an angle, while trying to straighten up, and it was her failure to straighten up which made it impossible to take her tow into dock 2.

▮ The Rochester knew of the existence of the floats at the end of dock L, which were properly lighted. The Rochester was not seeking to enter or leave the slips between docks L and M, or L and K, the river was one-half a mile wide at the end of pier L, and while there may have been a temporary ob-

struction to navigation at that point, the Rochester, if properly maneuvered, would not have contacted with the floats at the end of dock L. Nor did it so contact by accident. In fact the Rochester intentionally brought herself into contact with the Pennsylvania 575, knowing the conditions as to a large number of floats at the end of the dock, and therefore any violation that there may have been of statute or regulations was a mere condition and not a contributing cause of the accident.

It would be a strange rule which would allow the Rochester, when clear of the floats at the end of dock L, to seek to take advantage for her own purposes, distinct from entering the slip on either side of the dock, of the long line of floats at the end of dock L, that is to straighten up herself and tow to pass up beyond dock M, and then complain of the violation of statute or regulation by the Pennsylvania Railroad in having that number of floats at the end of the dock.

The fault was wholly that of the Rochester, which intentionally used the outer up-river corner of the 575 for the purpose of straightening up the Rochester and her tow.

Whether the force of contact was light or heavy, at the angle at which the Rochester and her tow were dropping down, the contact could not but be with some force; by using the 575 as a pivot, the Rochester was guilty of negligence and the sole cause of the injury. The Jersey Central (C. C. A.) 30 F.(2d) 269.

The Pennsylvania Railroad Company was under no obligation to so make fast its floats, at the end of dock L, as to support the weight of the Rochester and her tow, dropping as she was with the tide on the outer up-river corner of the 575, nor is it in any way responsible for the damage to its floats caused by such action on the part of the Rochester.

Even if the floats at the end of dock L were there in violation of statute or regulations, they did not become outlaws, and the Rochester by intentionally colliding with the 575 was guilty of negligence and is solely liable. Cornell Steamboat Co. v. Phoenix Construction Co., 233 U. S. 593, 34 S. Ct. 701, 58 L. Ed. 1107; The Crown of Galacia (C. C. A.) 232 F. 305.

The Rochester was negligently navigated by those for whose actions she is responsible in coming into contact with the Pennsylvania 575 with force, causing her and Pennsylvania floats 527, 504, and 551, at the end of dock L, to go adrift and some of them to contact with other Pennsylvania floats at the end of dock K, and to damage floats 575, 527, 504, and 551, and the Rochester was solely at fault.

The Pennsylvania Railroad and her floats, and any and all persons for whose actions she or her floats are responsible, did not in any way negligently cause or contribute to the damages caused to its floats, and is wholly without blame.

A decree may be entered in favor of the libelant, Pennsylvania Railroad Company, against the steamtug Rochester, with interest and costs, and the usual order of reference. Settle decree on notice.

If this opinion is not considered a sufficient compliance with rule 46½ of the Rules in Admiralty (28 USCA § 723), proposed findings of fact and conclusions of law in accordance with this opinion may be submitted for the assistance of the court, as provided by the rules of this court.